# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE

2017 MAY 23 PM 2:49

S.D. OF N.Y.

Manisha Singh

**17CV3935**

_____

Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been
assigned)

-against-

**Memorial Sloan Kettering Cancer Center,**
~~Sloan Kettering Institute for Cancer Research,~~

_____

~~Dr.N.V Kishore Pillarsetty, Ph.D and Steven M.~~
~~Larson. MD~~

Write the full name of each defendant. The names listed
above must be identical to those contained in Section I.

Do you want a jury trial?

☒ Yes    ☐ No

## EMPLOYMENT DISCRIMINATION COMPLAINT

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with
the court should therefore *not* contain: an individual's full social security number or full birth
date; the full name of a person known to be a minor; or a complete financial account number. A
filing may include *only*: the last four digits of a social security number; the year of an individual's
birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule
of Civil Procedure 5.2.

---

Rev. 3/24/17

## I.   PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Manisha | | Singh |
|---|---|---|
| First Name | Middle Initial | Last Name |

| 475 Main Street, Apt 12K | | |
|---|---|---|
| Street Address | | |

| New York | New York | 10044 |
|---|---|---|
| County, City | State | Zip Code |

| 718-679-7326 | manisharaj@gmail.com |
|---|---|
| Telephone Number | Email Address (if available) |

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:   Memorial Sloan Kettering Cancer Center

Name

1275 York Avenue

Address where defendant may be served

| New York | New York | 10065 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:   Dr. Steven M. Larson, MD

Name

415 East 69th Street, Zuckerman Research Center, Room 2064

Address where defendant may be served

| New York | New York | 10021 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

| | |
|---|---|
| Dr. N.V. Kishore Pillarsetty, Ph.D | |
| Name | |
| 415 East 69th Street, Zuckerman Research Center, 20th Floor | |
| Address where defendant may be served | |
| New York | New York | 10021 |
| County, City | State | Zip Code |

## II.    PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

| | | |
|---|---|---|
| Memorial Sloan Kettering Cancer Center | | |
| Name | | |
| 415 East 69th Street, Zuckerman Research Center, 20th Floor | | |
| Address | | |
| New York | New York | 10021 |
| County, City | State | Zip Code |

## III.    CAUSE OF ACTION

### A.  Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☒ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☐ race: _____

☐ color: _____

☐ religion: _____

☒ sex:     FEMALE _____

☒ national origin:   INDIA _____

**DEFENDANT 4**

Sloan Kettering Institute for Cancer Research

1275 York Avenue

New York, New York 10065

☐ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

My race is: _____

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: _____

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

## B.   Other Claims

In addition to my federal claims listed above, I assert claims under:

☒ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☒ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

_____

## IV.   STATEMENT OF CLAIM

### A.  Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐ did not hire me
- ☒ terminated my employment
- ☒ did not promote me
- ☐ did not accommodate my disability
- ☒ provided me with terms and conditions of employment different from those of similar employees
- ☒ retaliated against me
- ☒ harassed me or created a hostile work environment
- ☒ other (specify):   Sexual harassment, Intimidation

### B.  Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

SEE ATTACHED DOCUMENT

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V.    ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

      ☒  Yes (Please attach a copy of the charge to this complaint.)

           When did you file your charge?   December 12, 2016

      ☐  No

Have you received a Notice of Right to Sue from the EEOC?

      ☒  Yes (Please attach a copy of the Notice of Right to Sue.)

           What is the date on the Notice?   February 24, 2017

           When did you receive the Notice?   February 27, 2017

      ☐  No

## VI.    RELIEF

The relief I want the court to order is (check only those that apply):

      ☐  direct the defendant to hire me

      ☒  direct the defendant to re-employ me

      ☐  direct the defendant to promote me

      ☐  direct the defendant to reasonably accommodate my religion

      ☐  direct the defendant to reasonably accommodate my disability

      ☒  direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

Attorney fees and costs, damages for emotional distress, back pay, front pay, punitive damages, letter of recommendation similar to previous letters received in 2015 and 2016 of good performance, to ensure that I am published as first author on the 2 publications derived from projects which I lead & to ensure my name appears in the 3 collaborative publications which I contributed to (see attached)

## SDNY Employment Discrimination Complaint

## DAMAGES   continued from page 6

### FIRST AUTHOR PUBLICATIONS

1. Singh M, Chakroborty G, Medine E.I, Kalidindi TM, Lee SG  Punzalan B, Giancotti F, Pillarsetty NVK, and  Larson SM.   **Novel PET tracer for imaging androgen receptor-independent lesions in metastatic prostate cancer**

2. Singh M, Medine E.I, Ku A, Kalidindi TM, Lee  SG  Punzalan B, Pillarsetty  NVK, and Larson SM. **Radiolabeled EGF Derivatives as Radiotherapy Enhancers.**

### COLLBORATIVE PUBLICATIONS

1.      Cheal SM, Xu H, Guo HF, Punzalan B, Singh M, Lee SG, Fung EK, Kalidindi TM, Zanzonico PB, Cheung NV and Larson SM. **Theranostic pretargeting of HER2-expressing human carcinoma xenografts in immunocompromised mice with an anti-DOTA (metal) hapten IgG-scFv bispecific antibody.**

2.       (Work in Progress) **Project on Prostate-specific membrane antigen (PSMA)**: Osborne, Joseph A., Kalidindi, TM, and Pillarsetty NVK

3.       (Work in Progress) **Project on Vimentin**: Gangangari, Kishore G. and Pillarsetty NVK

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass,
cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are
supported by existing law or by a nonfrivolous argument to change existing law; (3) the
factual contentions have evidentiary support or, if specifically so identified, will likely
have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Federal
Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I
understand that my failure to keep a current address on file with the Clerk's Office may
result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to
proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 5/23/17 | | _Manisha Singh_ |
|---|---|---|
| Dated | | Plaintiff's Signature |
| Manisha | | Singh |
| First Name | Middle Initial | Last Name |
| 475 Main Street, Apt 12K | | |
| Street Address | | |
| New York | New York | 10044 |
| County, City | State | Zip Code |
| (718) 679-7326 | manisharaj@gmail.com | |
| Telephone Number | Email Address (if available) | |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☒ Yes    ☐ No

    If you do consent to receive documents electronically, submit the completed form with your
    complaint. If you do not consent, please do not attach the form.

# CHARGE OF DISCRIMINATION

This for is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

_State or local Agency if any_ _____ and EEOC

| NAME (*Indicate Mr., Ms., Mrs.*) | HOME TELEPHONE (*include area code*) |
|---|---|
| **Manisha Singh** | **(718) 679-7326** |

| STREET ADDRESS | CITY, STATE, AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| **475 Main Street, Apt 12K** | **New York, NY 10044** | ████████ |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one list below*)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (*include area code*) |
|---|---|---|
| **Memorial Sloan Kettering Cancer Institute** | **5,000+** | **(212) 639-2000** |

| STREET ADDRESS | CITY, STATE, AND ZIP CODE | COUNTY |
|---|---|---|
| **1275 York Avenue** | **New York, NY  10065** | **New York** |

| NAME | TELEPHONE (*include area code*) |
|---|---|
| **Steven M. Larson, MD**<br>**Zuckerman Research Center** | **(212) 639-7373** |

| STREET ADDRESS | COUNTY |
|---|---|
| **415 East 69th Street, ZRC-2064**<br>**New York NY 10021** | **New York** |

| CAUSE OF DISCRIMINATION BASED ON (*check appropriate box(es)*) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ AGE<br>☒ RETALIATION ☒ NATIONAL ORIGIN ☐ DISABILITY<br>☐ OTHER (*Specify:*) | EARLIEST (ADEA/EPA)         LATEST (ALL)<br><br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

**Please see the attached affidavit of Charging Party for the particulars of her complaint against Respondent.**

EQUAL EMPLOYMENT ~~~~~~~ PPP COMMISSION
NEW YORK ~~~~~~ F OFFICE

**DEC 1 2 2016**

**DATE RECEIVED**

WILLIAM J. SIPSER
Notary Public, State of New York
No. 02-SI4879418
Qualified in New York County
Commission Expires 11/10/~~ 2018

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary for State and Local Requirements)<br><br>I swear and affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| _Manisha Singh_ | _Manisha Singh_ |

My name is Manisha Singh, and I have been sexually harassed and retaliated against by Memorial Sloan Kettering Cancer Center ("Respondent"), resulting in irreparable and devastating personal harms and losses due to my opposition to objectification in the lab.

I was awarded a doctoral degree in cell biology and immunology, and I was most recently a post-doctoral research fellow at the Steven Larson Lab within Respondent's Department of Radiology, under the supervision of Steven M. Larson, M.D., who saw fit to retaliate against me following my protected complaints of sexualization and differential treatment at the hands of N.V. Kishore Pillarsetty, Ph.D.

I have maintained an impressive academic career in microbiology spanning 13 years and several continents, and I was excited to work alongside the fine scientific minds at Respondent institution until I was subjected to unwelcome disparate treatment and sexual abuse. I am a woman of Indian national origin who was hired by Respondent under a work visa, and assigned to report directly to Dr. Pillarsetty, a male radiochemist also of Indian national origin, and I was his only female direct report. From the inception of my employment, Dr. Pillarsetty degraded the terms and conditions of my employment by subjecting me to differential sex-based demands.

Starting in September 2014, Dr. Pillarsetty regularly asked me out and tried to ply me with alcohol at the faculty club, which was where he publicly "hugged" me in the complete absence of consent, thereby molesting me and creating a severely hostile work environment. During the course of several overly personal conversations initiated and pursued by Dr. Pillarsetty, I advised him that I was divorced and living alone in the US and still without a green card, which is when his attitude toward me changed for the worse, when he realized that my existence in NY was very much based on my visa and my job, and that I couldn't move anywhere without dire consequences.

He then started singling me out for additional work not related to my project, and he would keep me late in the lab, including on Friday nights, when the lab is typically empty as employees have either gone home or left for the faculty lounge. Dr. Pillarsetty would then stalk me in the empty lab and make me sit with him and show me random data, all the while sitting too close and on top of me, intimidating me with his authoritarian show of male prerogative and privilege, then crossing into my personal space to control and dominate me.

Dr. Pillarsetty asked if I had a boyfriend, to which I responded no, I was divorced from an abusive and violent husband, though I was trying to meet people and go on dates, and he said that he was unhappy with his marriage and trying to meet new partners, too, but I ignored this unsolicited personal information. In response, he then devised new and creative ways to keep me working late and then on weekends, his latest ploy to compel and coerce me into starting a sexual relationship with him, by precluding all other social interactions.

One way to coerce me to consort with him outside of the workplace was his constant inveigling related to "socializing," as he lectured me that it was "not enough to do good science," we need to "make friends and connections with powerful people" to survive. As it became clear that I would not submit to his unwanted sexual advances and control tactics, his supposed ardor toward me transformed into open hostility, and he concocted constantly new ways to harass me, mostly through assigning new projects without sharing the appropriate background, abbreviating the time frames allotted for completion, assigning extra work just for punishment and then shouting at me for all manner of perceived slights related to his bruised ego due to my refusal to have sex with him; the work product was merely the instrumentality of his control over me. I've no doubt that if I had given him access to my body he would have evaluated my work fairly.

He treated male comparator members of the lab with respect and promoted their careers, but continued to torment and bully me, refusing to allow me to even attend my own conference to deliver my own academic paper. Through 2015 and 2016, Dr. Pillarsetty intermittently sexually abused me, touching my back, breasts and shoulders without consent in his office, where he conspired to get me alone. I always signaled to him that I did not find his depredations welcome, but I was intimidated from complaining too forcefully due to my precarious alienage and inability to quit without becoming out of status on my work visa, so I was stuck, scared, and suffering.

Dr. Pillarsetty afforded all the male members ample career opportunities and he allowed them to present and attend international conferences, even if they didn't work on the particular project, In marked and illegal contrast, he did not promote my career as he promised and refused to send me to conferences. When I questioned him over this disparate treatment he yelled at me and said, "so sad, you are the only one left in the lab. You could have gone to Hawaii to present your paper if you were just more friendly with me." I'll bet.

Thereafter, I finally complained to Vice President Ushma S. Neil, Ph.D., and Maria Fernandez of Respondent's human resources department, and I saw a therapist at the Employee Assistance Program. On June 29, 2016: I requested an appointment with Lab Head Dr. Larson to discuss the sexualizing differential treatment, and on July 6, 2016, I met with Dr. Larson to file my protected complaint, and that was when I was terminated for pretextual reasons in obvious retaliation for my protected sex-based civil rights complaints.

Finally, Respondent retaliated against me further when Dr. Larson told a would-be employer that I am "a little shy and retiring and I think so by nature, she is a retiring person and not real aggressive, and that's sometimes good and sometimes not as good, as she is shy and reluctant at times." Such outrageous, sexist, documented corroboration occurring in close temporal proximity to my protected complaint is proof positive of Respondent's complete ratification of Dr. Pillarsetty's abuse and attempted control of my work and body, and I feel that Respondent is retaliating against me for holding him and Respondent accountable for not protecting me from such severe and pervasive discriminatory animus that has resulted in my wrongful dismissal, eviction proceedings against me, and potential deportation.

In other words, even though Respondent well knew that my work was objectively satisfactory, it was willing to ruin my life to support the misogynistic expectations of a depraved supervisor who would only value me based on my willingness to provide sexual favors in return for the quid pro quo of continued employment, which they knew was a condition precedent to remaining in lawful immigration status.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820
District Office: (212) 336-3620
General FAX: (212) 336-3625

Manisha Singh
475 Main Street Apt 12 K
New York, NY 10044

Re:   EEOC Charge No. 520-2017-00556
      Manisha Singh  v.  MEMORIAL SLOAN KETTERING CANCER CENTER

Dear Ms. Singh,

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission") has reviewed the above-referenced charge according to our charge prioritization procedures. These procedures, which are based on a reallocation of the Commission's staff resources, apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce.

In accordance with these procedures, we have examined your charge based upon the information and evidence you submitted. You allege you were discriminated against your gender  in violation of Title VII of the Civil Rights Act of 1964, as amended and subject to retaliation.

Based on your testimony and an analysis of all the evidence submitted, the Commission is unable to conclude that the information establishes a violation of Federal law on the part of Respondent.  This does not certify that Respondent is in compliance with the statutes.  No finding is made as to any other issue that might be construed as having been raised by this charge.

The Commission's processing of this charge has been concluded. Included with this letter is your Notice of Dismissal and Right to Sue.  Following this dismissal, you may only pursue this matter by filing suit against the Respondent named in the charge within 90 days of receipt of said notice.  Otherwise, your right to sue will be lost.

Please contact Federal Investigator Mabel Tso at Mabel.Tso@eeoc.gov if you have any questions.

Sincerely,

_____ for

Kevin J. Berry
District Director

FEB 2 4 2017
_____
Date

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Manisha Singh**
**475 Main Street**
**Apt 12 K**
**New York, NY 10044**

From:  **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐  On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-00556** | **Mabel Tso,**<br>**Investigator** | **(212) 336-3762** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_(signature)_

**Kevin J. Berry,**
**District Director**

FEB 2 4 2017

(Date Mailed)

Enclosures(s)

cc:  **Peter M. Sanders, Esq.**
**Associate General Counsel**
**MEMORIAL SLOAN KETTERING CANCER CENTER**
**633 Third Avenue, Fifth Floor**
**New York, NY 10017**

**Jack Tuckner, Esq.**
**TUCKNER, SIPSER, WEINSTOCK & SIPSER, LLP**
**120 Broadway, 18th Floor**
**New York, NY 10271**

Enclosure with EEOC
Form 161 (11/16)

**INFORMATION RELATED TO FILING SUIT**
**UNDER THE LAWS ENFORCED BY THE EEOC**

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Courts often require that a copy of your charge must be attached to the complaint you file in court.  If so, you should remove your birth date from the charge.  Some courts will not accept your complaint where the charge includes a date of birth.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

1.      I applied and was selected for the postdoctoral fellowship position at Memorial Sloan Kettering Cancer Center (MSKCC)/ Sloan Kettering Institute for Cancer Research (SKICR). On August 4, 2014 I joined Dr. Steven Larson's lab; he is the Head of the Radiology Department at MSKCC.  Dr. Larson is the supervisor of my immediate supervisor Dr. Kishore Pillarsetty (KP).

2.      I attended a post doctoral orientation in early August 2014.  I received a handbook from MSKCC /SKIRC which included a lot of information including but not limited to training, housing, resources and health benefits.  The handbook also stated that at least one time per year post doctoral fellows would attend a conference.

3.      During my interview and after, KP promised me a lot of things, but in particular, he promised to promote my career, training and mentorship, to help me to succeed as an independent faculty scientist, and to establish me as an independent researcher.  I was also advised that he would send me to conferences and advanced training.  KP also spoke about my working in the lab for 4 to 5 years and addressed my salary by saying "there is no problem with the grant funding money,  we can always shuffle money from one project to another and one Principal Investigator to another."  He (KP) also insisted on my commitment to continue to work in the lab for at least July 31, 2018 or more. He also made it clear and reasoned that after investing on my training and on specialized commitment /work he does not want waste time and resources invested on me by leave the lab which I agreed. I totally agreed to continue and committed to the project and lab.

4.      I joined this position on J1 visa, which was due to expire in July 2015. Meanwhile, I had to get a J1 waiver and file for H1B to stay in the job and in USA. KP assured me that there would be no problem with changing the visa status to H1B and later green card. He also said MSKCC/ SKIRC has a very a good system in place to get the green card with dedicated fulltime appointed immigration attorneys.

5.      I am the only postdoctoral fellow in the lab (postdoc) and only woman working under the supervision of KP.  In the lab there is also one male technician Teja Kalidindi with a MS degree and one male PhD Kishore Gangangari  student and one more very senior person, a male  who has been working at Sloan for 15 years but I am not sure if he works under KP or not. During all the lab discussions, all of us 5 (4 male and 1 female (myself) attended the lab meetings held every week.

6.      KP designated me one project (EGFR) to head and also gave me additional work to contribute as a collaborator on other projects. At this point I had applied for my J1 waiver to get the H1B visa process initiated. My H1B visa approval got delayed because of processing in getting a J1 Waiver from India. As promised MSKCC/ SKIRC helped me to get an HIB visa for 3 years to expire in July 2018.

7. In the fall of 2014, after going to the faculty club with KP and other colleagues, KP for the first time touched me inappropriately, hugging me very tightly while rubbing my back. This made me uncomfortable and I felt embarrassed in front of everybody and I did not know what to do in this situation. I left the faculty club on my own. I decided not to go to faculty club with KP anymore.

8. From October 2014 to December 2014 KP repeatedly asked me to go to the faculty club and I continued to make excuses about having to work to avoid going with him.

9. In January 2015 KP started giving me more work, which was not related to my project and asked me to work late in the lab. As a result I was on several occasions the only one working in the lab, and he would join me there so that we were the only 2 people in the lab. My desk is very small and he used to sit very close to me, and he would lean on me, touch my arm, shoulder, but there was no reason for the contact. I felt very uncomfortable because of his contact and the fact that we were alone.

10. In February/ March 2015 KP mentioned that he is not happy in his marriage and he is looking for another partner. I didn't know how to respond to his comments I just continued to work.

11. In the spring of 2015 he continued to assign me work that required me to stay late at the lab. He did not assign work that required my male colleagues to stay late. When I was alone in the lab with him, he would sit very close to me and sometimes come behind my back to show something on computer screen. He would put his hand on my thigh, he would sit really close, and he was always finding a reason to be in my personal space.

12. On one occasion he put his hands on my shoulders and slid his hands down my front and touched my breasts. He then hugged me tightly from behind. I was shocked and stiff I didn't know what to do. I stood up, and when I try to walk, he hugged me tightly and rubbed his hand down my back. I pushed myself away from him and left the room.

13. On other occasions during the spring of 2015, he touched parts of my body like my lower back, breast, hands and shoulders. I distanced myself when this happened by standing away from my chair and leaving the office. I thought he got my signal that I did not like his behavior.

14. I felt very intimidated by his behavior but I felt stuck at that time because I did not have any other option than staying at that place. My only other option was to go back to India which I did not want to do for several reasons. I

thought about talking to HR and other people but I was afraid of losing my job. I was also worried that they would try to bury the real issue.

15.    KP promoted the career of all other male members of the lab with career opportunities, sending them to conferences despite the fact they hadn't worked on the relevant projects.  By contrast, he refused to allow me to go to conferences and internal relating to my work.

16.    For example, when my abstract was selected for poster presentation, I really wanted to attend the World Molecular Imaging Conference (WMIC) to advance my career.  When I went to talk to KP in approximately July 2015 about attending the WMIC conference I was told that there is not much money for my attendance of the conference.  I offered to pay for my trip but KP said that it will not look good on him. KP said I can go on vacation to Hawaii but I was not allowed to register for the conference.  I said that I do not have money to go on vacation to Hawaii and not go to the conference. I asked who will be presenting my poster with my name and KP said that he will be presenting my poster.  In fact, he allowed a more junior male colleague to present my work.

17.    In August 2015 I needed to get my Visa stamped and I also wanted to see my family in India in September 2015. This was my first request for a vacation while I worked at MSKCC, and I did not take any vacation during the past year, as I worked Federal Holidays. I asked for his approval, He got very angry saying "who will take care of all the experiments? You cannot go now? There are lot of things to do in the lab." I said if I want to go anywhere in the world I need stamp on my passport otherwise I cannot leave USA for anything. He agreed very reluctantly. KP did allow the other male lab members to go on vacation a few times a year but he did not want me to go anywhere even though I worked for a month when I was not paid (August 2015).

18.    Everyone who worked in our lab but me went to the conference.  In September 2015, the day before everyone was leaving for the conference, KP came to my desk and said "So sad, you are the only one left in the lab. You could have gone if you were very friendly with me. Getting success in your career needs more than hard work." His statement was perfectly clear – I would have been permitted to attend the conference if I had accepted his sexual advances and engaged in sexual activity with him.

19.    When everyone returned from the conference in September 2015 my colleagues on the floor were asking me for the reason of not going to the conference. I explained the situation and when KP found out he came to me and told me that I could lose my job because I was talking to others about this incident.

20.    In September 2015 I went to Dr. Larson and discussed KP treating me differently than the men in the lab, making sexual advances towards me and then calling it "acting friendly"; retaliating against me for not accepting his

advances and preventing me from attending the conference.  I never got a response from Dr. Larson about my complaints.

21.     In February 2016 at the end of a lab meeting I stayed little longer to discuss some experiments. When everybody was gone KP said that "You have lot of potential.  I really want to succeed you in your career. I will help you to succeed. I really like you and I mean it".

22.     In March and April 2016 KP  touched me several times in an unwelcome way.  In the lobby area outside the lab he came up behind me and grabbed my shoulders.  I did not see him coming and I did not like him touching me and there was no one in that area.  He also put his hand on my shoulders when we were alone discussing an experiment in small chemistry room.

23.     In March /April 2016 after submission of the abstract for World Molecular Imaging Conference (WMIC) KP made statements at various times in his office stating , "what to do with you?"  "Why do I think I started drinking too much because I have to deal with you?" " You should be thankful that I am doing so much for you." "Nobody else will do this for you." Then he asked me to go to faculty club with him on a Friday evening. Since we had just finished the submission I did not have any excuse to do work and to stay longer.   I went with KP and I had a fruit juice as I do not drink alcohol.

24.     At the faculty lounge KP started explaining "how hard work is not enough to get success in any field." He sat very close to me put his hands on my thighs.  He questioned "why I was not giving a chance to anybody else ? Was it because of my divorce? " I felt that all the information that he learned about me was what he was now using to sexually harass me. I did not feel comfortable dealing with this similar situation as he had touched me inappropriately in the faculty club in September 2014. I got up and left the faculty club.

25.     After this situation I talked with April Due (secretary to Dr. Larson Head of the Dept).

26.     In March/ April 2016 on a Friday, I was arranging samples at the gamma counter.  There were some problems with the machine, and I was trying to fix it. It was evening after 6 PM. KP came from behind and put his hands on my waist and slide on my butt area. KP moved his body very close to me and hugged me from behind. I smelled alcohol on his breath.  I distanced myself from him and stood a little far away.

27.     Early in 2016 I spoke with April Due and I told her I wanted to talk with Dr. Larson and she asked about what it was about.  I told her I wanted his guidance related to these unwelcome advances, touching and issues with KP but April told me that Dr. Larson was travelling so I was not able to speak with him.

4

28.     In April/May 2016 KP started discussing his married life. He said he is not happy in his marriage. She is very busy at work, and they do not get time together. He stated that he was facing a lot of differences with his wife. He said that it is not a big deal in western culture to separate from their partner or have another partner while they are still married. He also said "it is more important to be happy than following rules and we should do whatever makes us happy. You should think about this. You are wasting your time and sexual pleasure in the past 11 years and you are not biologically active because of your strong beliefs. I really wonder how you spend your time without a partner when you have sexual desires. Did you even have a boyfriend in all those years and what is your current libido status?" I said that I am still looking for a boyfriend and I am meeting lot of people. He said "I could be your friend too and support you in all avenues, but you are ignoring me. You have struggled, and you should make your life easy. You have a lot of potentials, and you should use it. You are very attractive woman." He has already told me this many times, and I felt very uncomfortable with this kind of discussion and behavior. I replied that "It is against my ethical and moral values to have a relationship with married men and also in the work environment". He was once again suggesting that he would advance my career only if I engaged in sexual relations with him.

29.     In April/May 2016 I was in KP's office discussing an experiment. KP sat very near to me, put his hands on my thighs and said, " You have a lot of potential, I want to make you a successful woman. I care about you a lot; I really love you. I told you many times and I really mean it. I can help you to succeed in science; I have a lot of connections. I know a lot of influential people at MSKCC. I know that you have gone through tough times in your personal life, but it does not mean that you should not give a chance to anyone else in your life." He put his both hands on my shoulder. He said, "You are wasting your life. You should enjoy your life. You should give chance to other people like me. I always think about you. You are a very attractive person. Why do you think that I drink so much? I drink alcohol because of you. Why don't you understand? You are always in my mind. Science is not enough to succeed. You have to give special favors. This is how things works in modern world. You also have to understand that whatever happens in this room stays in the room. Many things happen between Dr. Jason Lewis (another director lab Head) and me. Nothing goes outside and nobody knows. Similarly, nothing should go outside of this room. Do you understand or not? You are an adult person. You have lived in USA for long time. You cannot take anything for granted. It is always 'give and take.' In your case, you are testing my patience. You avoid me and all my invitations, and you have seen the results. You haven't gone to any conferences. Everyone needs something back in return. Don't you want to be successful? I will help you with everything as a friend. I know that you need a green card to stay in the country because I have gone through everything. You do have a lot of potential because you are very attractive. I will help you with everything, but you do have to listen to me sometime." While he was speaking his hands were sliding on my thigh, shoulders, and back and I was struggling with how to minimize the contact. This was the third time that he had explicitly requested sexual favors in exchange for advancing my career, and there had been many other times when he suggested a sordid exchange

through his improper and unwanted touches. I said that we could discuss my future some other time. I am in between experiments, and I have to change the reagent. I left.

30.     In April/May 2016 KP grabbed my shoulders few times intentionally few times while I was going in the lab by putting his hands on my shoulders and made an excuse for touching me.

31.     One day in the spring of 2016 he specifically called me in his office. I had met with other Principal Investigators about future jobs at MSKCC I wanted to see if I could join another lab after six months or a year after finishing the projects with Dr. Larson and KP's labs. I didn't want to work with KP in the future.

32.     KP called me into his office and me and said that he did not want me to learn everything and leave the lab. The Department had invested a lot of money in my training, and they did not expect me to leave without utilizing my skills. It would be a waste of department resources.

33.     KP threatened and intimidated me saying, "You know that you will not get a job without a recommendation letter in our field. If you are looking for another job, I might not give you a good letter. Why would I give you letter? I do not want our training utilized by somebody else. We are training you, and someone else will get the benefit. You should know all the rules, and you do not follow anything."

34.     KP continued to threaten me saying "Hard work is not enough. I will not give you a letter until you agree to follow my instructions. You have to do what I tell you to do. I told you that I would help you with everything including the green card. We sponsored your H1B for three years. We can file Green Card for you. Once you finish with your project and Green Card, you are free to go anywhere. You should give favor to yourself and be an adult. You are still following Indian tradition. This place is not India. Americans follow different culture. You are a very attractive woman, and you do have potential. You are wasting your potential. Just look around, and you will understand. I tried to be your friend  and help you but you avoid me. I feel that you are insulting me by not saying yes to me. This is a 'give and take' culture. You are not giving me anything in return. Who are you waiting for? You don't even have a boyfriend. I am ready to be your friend, and you are not ready for that. Your life will be much easier. You do not have to struggle this much for anything. I will take care of everything. I love you, and I am attracted to you.  You are not even ready to come for drinks and fun together.  Why do expect me to do anything for you?"

35.     As I had told KP on previous occasions when he offered me career and immigration help in exchange for sex, I replied that it was against my ethical and moral values to have relations with married men and also in work the environment.

36.     Around June 2016, perhaps realizing I would continue to reject his unwelcome sexual advances, KP became extremely abusive.  He created a very toxic environment. He had already been yelling at me in the lab. He was insulting me in the lab in front of other people even more.  He had already been demeaning to me during lab meetings and he continued. He made my life hard in every possible way to punish me for not accepting his advances. I began to believe that I would have to trade my body to achieve career success which is against my principles. My health began to deteriorate.

37.     In June 2016 I had to present my work in Dr. Lewis and Dr. Larson during at a lab meeting. It was within one week.  KP was very happy after my presentation. He said you did very good job, just have more confidence. You have lot of potential. Then he also said: "What to do with you? I tried to push you hard. Then I tried to be your friend (he gestured coming close to me and putting his hands on my shoulder very tight), but that nothing worked on you". I felt very uncomfortable and did not say anything in response.

38.     As punishment for rejecting KP's advances, I was not invited to or informed about meetings with collaborators such as Dr. Giancotti and Dr. Goutam for the projects that I worked on.  KP attended the meetings alone with the collaborators.  When I met the collaborators after the meetings they asked me "What happened? Why didn't you come to the meeting?" I was embarrassed and made excuses for why I wasn't present as I didn't want to tell them that I was not present because KP did not allow me to attend. KP was damaging my reputation among the Lab Heads that I collaborated with to retaliate against me for refusing to engage in sexual activity with him.

39.     I was not allowed to go to the conferences and other internal talks and conferences within the institution or Tri-Institution (Sloan, Rockerfeller and Cornell). To advance my knowledge and network to help my career.  If I did attend when I returned KP he would question my whereabouts KP would lecture me, tell me that I am wasting time and money and tell me to utilize that time working in the lab. I witnessed KP encourage the other male lab members who were junior to me to attend the talks and conferences.

40.     On June 23, 2016, I spoke with April Due, the Secretary of The Department Head Stephen M. Larson, MD. I told Ms. Due that I needed to talk with Dr. Larson.

41.     Ms. Due thought it had to do with work and asked me to include my supervisor, KP in the meeting. I replied, "No, I don't want KP in the meeting as it had to do with him." I told her "I am being discriminated against by him and experiencing unwelcome touching and unwanted advances." I told her I felt uncomfortable about working with KP and I made it clear that I needed to talk with Dr. Larson because it was hard to work for KP and I was looking for a solution. I also said I was seeking guidance from Dr. Larson on what to do in this dire situation.

42.     Ms. Due then said if this is Human Resources related that I should go to meet with Human Resources.

43.     I told Ms. Due that I wanted to talk with Dr. Larson first. Ms. Due said I should bring Human Resources to the meeting and then said let me arrange the meeting, and I will let you know.  I asked her again for a meeting with Dr. Larson the Department Head  by email.

44.     On approximately June 30, 2016, I met Ushma Neil, PhD Vice President Vice President, Scientific Education & Training who deals with Post-Doctoral Affairs at MSKCC.  I told her that KP was discriminating against me because I am the only woman in the lab.  I said I was being treated differently than the other male members of the lab. KP was creating a hostile work environment for me with verbal abuse and sexual advances.  I also told her that he was threatening me with my visa situation as I was in a very delicate situation because I cannot just quit my job.  I told her that I wanted to publish the 2 papers that I was working on at the time.  I would like for Dr. Larson to find a solution to help me to finish working on the 2 papers and then help me to find another position in this Dept or another Dept.

45.     On June 30, 2016 Dr. Neill also asked me "Can you work for Dr. Pillarsetty or not at this time (to finish writing the papers)?" I said, "No I cannot, and I needed a solution because I wanted to publish my 2 papers as it was important for my career." She also asked whom I would like to work if not with KP?  I answered, " I would like to work with Dr. Larson to finish these 2 papers and then with Dr. Charles Sawyers because I was currently working in the collaboration with his lab." She asked for few more names and she also suggested Dr. Jayanta Chawodary "because he is a very genuine person." She said that she would help me with this complicated situation and make me to get these papers published. She said that meet me after Dr. Larson's meeting. She agreed that I should talk to Dr. Larson and she also recommended that I go to Human Resources. She said that she would work on my case confidentially and take some strong action because this is not acceptable in this reputed institution.

46.     One June 30, 2016 I also told Dr. Neill that KP's behavior was affecting my health. Dr. Neill recommended that I go to Employee Health Counseling that offered to employees of Memorial Sloan Kettering.  I followed the suggestion of Dr. Neil and went to the Employee Health Counseling and I spoke with a therapist.

47.     In my response to a request for a meeting with Dr. Larson and Human Resources, I received an email which scheduled a meeting on July 6, 2016.

48.     I requested a second meeting on July 5, 2016 with Ushma Neill, PhD Vice President Vice President, Scientific Education & Training by email.  She said she is busy and I should meet Thomas Magaldi who assists Ushma Neill. I met with Mr. Magaldi and talked about all the sexual harassment, intimidation, threatening,

8

abuse, exploitation of my visa situation and gender discrimination. He said he would do his best to help me out of this situation and this is part of their job to help Post – doc and these issues arise a lot between Post-doc and Lab Heads. He explained they help post-docs to get an internal transfer and get a credit of their hard work.  Mr. Malgaldi also told me to meet Professor Andrew Koff.  I did not get a chance to meet with Professor Koff.

49.     The next day, July 6, 2016, I was scheduled to meet Dr. Larson to discuss my complaints about KP's sexual harassment and advances, gender discrimination and other issues.

50.     On July 6, 2016, I went to the meeting which I believed was with Dr. Larson and Human Resources.  When I entered the room, I saw Dr. Larson (The Dept Head), KP  (My immediate supervisor) and Rosalinda Herard Severin (Dept Fund Manager).  No one from Human Resources was present.

51.     As soon as I entered the room of Dr. Larson, Laboratory Head/ Department Head  said "We are terminating your contract ".  I was extremely shocked and surprised and I said "This is really surprising".  Dr. Larson then signed a document in front of me and KP also signed the document and then they gave me the document to sign.   I said continually I don't know what this is and I cannot sign this right now.  I said "I was not prepared for this, I asked for the meeting and I was not prepared for this. This is the number 1 institution in the world I was expecting a little more transparency and fair treatment. I don't know why this letter is being given to me."  I did not read the content of the letter at that time. The letter it was later sent to my email through Ms. Herard Severin.  I was afraid and did not know how this is going to affect my visa situation.

52.     In the meeting Dr. Larson also said we are not renewing your contract because of your performance issue.

53.     I then felt like I had to defend myself.  I began to list the tasks that I had completed and asked them how my performance was bad.

54.     I felt blind-sighted as my performance issues have never been discussed with me.  In fact, I had received positive feedback in past two years. I had been extremely productive, having filled more lab notebooks than most researchers for a comparable time period and having submitted more grants than anyone else on the floor.  I had also gotten numerous excellent letters of recommendation in connection with grant submissions.  The most recent of these was written by KP in April 2016.

55.     Dr. Larson then said "OK, fine, I understand everything. It may not be a performance issue. You both just did not get along".

56.     Dr. Larson gave me the document stating that my contract will end on September 30, 2016. This is the first and only time they told me about ending my contract, and never ever during my stay starting August, 2014. This was shocking to me as I am always appreciated for my excellent performance and innovative work ethic -- until this date July 6, 2016.

57.     Directly after the 30 minute meeting I had 15 minutes with only Dr. Larson because I had asked for a meeting with him in late June. At this point I felt deceived and thwarted as I did not have a chance to talk about any issues before being blind-sided with the termination.

58.     I had another meeting with Dr. Larson on July 8th (Friday) for 30 minutes hoping that something that I said would change the termination. I thought he would help me. My focus was how to find a solution to the issue of working in the lab and now I had new problem of termination, my visa and what would happen to me now? He said that if I have any problem I could go to HR. I felt dismissed and defeated.

59.     In light of my strong performance at the job and lack of any prior criticism of my work, the statement in the termination letter that I had "inefficient work performance on several occasion" is a false and fabricated statement with the intention to malign and ruin my career and reputation.

60.     Usually, if a post-doctoral fellow employment contract is not going to be renewed an employer advises the employee at least 3 months in advance. In my case I received a termination letter in July 2016. My contract was supposed to renew in July 2016. I should have been advised by May 2016 if my contract was not being renewed due to performance issues or for any other reasons. The timing of my termination – precisely when I made it clear that I would no longer tolerate KP's mistreatment – is further evidence that my supposed performance problems were a pretext for terminating me in retaliation for my efforts to report KP's illegal behavior.

61.     The hospital agreed to extend my contract until September 30, 2016, to give me more time to find a new job.

62.     In August 2016 I returned to work. KP called me to discuss ongoing experiments. He stood very close to me and held my back and said "I can't change anything now. You were trying to file a complaint against me; You know that I am working in this place for more than 12 years and I know everyone. I know that you are in desperate situation, but I can still be your friend and help you in another area of your life." KP then slid his hand on my back and butt area. He still did not stop his unwanted advances and sexual harassment.

63.     I became depressed and my health suffered.

64.     In September 2016 I started looking for another job thinking that I could transfer my visa.  I have been attempting to obtain a new position.  At times I had at least 3 interviews in a week.

65.     Dr. Larson /KP/ MSKCC/ SKICR have been giving negative recommendations to prospective employers, and I have not been able to secure a new position.

66.     After my potential employers contacted KP/Dr. Larson/ MSKCC /SKICR and at least 2 interviews were cancelled.

67.     At other times after I interviewed the prospective employers contacted KP/Dr. Larson/ MSKCC /SKICR  they did not hire me stating they did not get good recommendations.

68.     I live in Memorial Sloan Kettering housing. In December 2016 Defendants sent me a court notice for eviction. I am currently in the housing court dealing with this eviction.

69.     In December 2016 I filed EEOC complaint to seek justice for all that I am enduring.

70.     I continue to deal with health issues because of this stressful, inhuman and traumatic experience and termination in July 2016.  I continue to receive medical treatment following the termination and stress due to all the events I have experienced.  I am dealing with this on my own, I have no family in this country.  I continue to receive treatment following my depression in July 2016 and currently still seek treatment.  I am looking for justice as my health, career and reputation are suffering and continue to suffer.  I pray this court will see the harmful acts and their impacts on my life that have occurred and render a justice.