UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MANISHA SINGH,

*Plaintiff*,

-against-

MEMORIAL SLOAN KETTERING
CANCER CENTER, SLOAN KETTERING
INSTITUTE FOR CANCER RESEARCH,
DR. N.V. KISHORE PILLARSETTY, PH D,
AND STEVEN M. LARSON, MD

*Defendants*.

Case No. 1:17-cv-3935-GBD-KNF

**AMENDED COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff MANISHA SINGH ("Dr. Singh") by and through her undersigned counsel,

QUINN EMANUEL URQUHART & SULLIVAN, LLP, as and for her Amended Complaint in

this action against Defendants Memorial Sloan Kettering Cancer Center ("MSKCC"), Sloan

Kettering Institute for Cancer Research ("SKI"), Dr. N.V. Kishore Pillarsetty, Ph D ("Defendant

Pillarsetty"), and Steven M. Larson, MD ("Defendant Larson") (collectively, "Defendants"),

hereby alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for Defendants' unlawful discrimination on the basis of sex, including

*quid pro quo* sexual harassment, hostile work environment, disparate treatment and

unlawful retaliation in violation of 42 U.S.C. sec. 2000e et. seq., Title VII of the Civil

Rights Act of 1964, as amended in 1991, ("Title VII"), the New York State Human

Rights Law, New York Executive Law §§ 290 et seq. (the "NYSHRL"), the New York

City Human Rights Law, Administrative Code §§ 8-107 et seq. (the "NYCHRL"),

seeking relief and damages to redress the injuries Dr. Singh has suffered as a result of

being sexually harassed, discriminated and retaliated against by her former employer on the basis of gender.

2.    Dr. Singh also seeks relief for common law tort claims including civil battery, defamation *per se* and intentional and negligent infliction of emotional distress.

3.    For nearly two years, Defendant Pillarsetty engaged in a pattern and practice of committing *quid pro quo* sexual harassment, civil battery, discrimination and finally, retaliation against Dr. Singh, creating a pervasive and hostile work environment, defined by repeated offensive, degrading, and sexually harassing actions, statements and touching.

4.    But Defendant Pillarsetty's misconduct could not have continued without the help of the other defendants.  Defendants Larson, MSKCC and SKI failed to protect Dr. Singh and to prevent or remedy the unlawful acts against Dr. Singh, when they were brought to their attention.

5.    Defendants retaliated against Ds. Singh for rejecting Defendant Pillarsetty's sexual advances and reporting the discrimination and harassment by terminating her employment.

6.    Defendants defamed Dr. Singh's professional reputation by making or publishing false statements in references to Dr. Singh's potential prospective employers.

## JURISDICTION AND VENUE

7.    This Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

8.    This Court also has subject matter jurisdiction pursuant to 28 U.S. Code § 1331, with federal questions involving Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  An express grant of federal court jurisdiction over these federal claims is found at 42 U.S.C. sec. 2000e-5(f)(3).

9.    Defendants are each subject to the jurisdiction of the Court pursuant to 28 U.S.C. § 1332 with proper venue pursuant to 28 U.S.C. § 1391, because, *inter alia*, Defendants are residents of and/or are domiciled in this district, and the events giving rise to the claims, and the injuries caused to Dr. Singh by the Defendants' tortious conduct occurred in this District.

## THE PARTIES

### I.    Plaintiff

10.   Dr. Singh is a woman of Indian citizenship, employed as a pharmacological fellow by Defendants from approximately August 4, 2014 to September 30, 2016.

### II.    Defendants

11.   Defendant MSKCC is a cancer treatment and research institution in New York City. MSKCC was formed as the corporate entity to coordinate and guide the overall policy for Memorial Hospital and the Sloan Kettering Institute.

12.   Defendant SKI is the research and training arm of MSKCC in New York City, employing more than 100 laboratory investigators, 400 research fellows, and 200 graduate students (both PhDs and MD/PhDs).

13.   Defendant Dr. N.V. Kishore Pillarsetty, Ph D, a citizen of New York, is a male Radiochemist in the Radiology Department of MSKCC.  Defendant Pillarsetty was Dr. Singh's direct supervisor.

14.  Defendant Steven M. Larson, MD, a citizen of New York, is the Donna and Benjamin M. Rosen Chair in Radiology at MSKCC.  Defendant Larson is also an Attending Physician in the Molecular Imaging and Therapy Service in the Radiology Department of MSKCC and Member and Lab Head in the Molecular Pharmacology Program.  Defendant Larson is Defendant Pillarsetty's direct supervisor.

### PROCEDURAL REQUIREMENTS

15.  On or around December 12, 2016, Dr. Singh filed a charge of discrimination, arising out of the facts as described herein, with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII.  On or around February 27, 2017, Dr. Singh received the Notice of Right to Sue, issued by the EEOC.  The original complaint was filed on May 23, 2017, within 90 days of Dr. Singh's receipt of the Notice of Right to Sue.

16.  Pursuant to NYCHRL § 8-502, Dr. Singh will serve a copy of this Amended Complaint on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the New York City Law Department, thereby satisfying the notice requirements of the New York City Administrative Code.

### FACTUAL ALLEGATIONS

**III.   Background**

17.  It is not easy for a woman to enter the field of science.  Even less so in India, where girls and women are routinely discouraged from learning and higher education, sometimes by their own families, sometimes by their husbands.  Being a woman of color in science and living in the United States on a visa dependent on employment only makes things more challenging.  Dr. Singh overcame countless obstacles to maintain an impressive academic

career spanning 13 years and three continents.  Throughout her career, Dr. Singh has been published six times, including as a first author on a project examining breast cancer vaccine efficacy that was published in the British Journal of Cancer in 2014.

18.     As a result of her grandfather's death from blood cancer and her mother's battle with breast cancer, cancer research became a deeply personal and important mission for Dr. Singh.  She considered her fellowship at the preeminent cancer research institute of the world the highlight of her career.  Dr. Singh hoped to take the knowledge and skills she learned at MSKCC/SKI and apply them to make a real difference in the lives of the millions of people who are diagnosed with cancer each year.

19.     Instead of giving her the tools to succeed, the Defendants disregarded Dr. Singh's suffering at the hand of Defendant Pillarsetty.  Her efforts to avoid and escape Defendant Pillarsetty's unrelenting and unwelcome sexual advances were unsuccessful.  Dr. Singh could not quit her job at MSKCC/SKI without losing her visa and leaving the country, trapping her in an untenable situation.  She had no recourse other than reporting her supervisor's misconduct.  She did so on multiple occasions to multiple employees of MSKCC/SKI, but her pleas for help fell on deaf ears.  Instead of protecting her, the Defendants are now jeopardizing the career Dr. Singh spent 13 years building, in order to shield her abuser.

20.     Dr. Singh earned her PhD in Cell Biology and Immunology from Erasmus Medical Center in the Netherlands, in 2013.  After completing her PhD Thesis Research at the Albert Einstein College of Medicine, Dr. Singh applied and was accepted as a postdoctorate Research Fellow at MSKCC/SKI.

21.     On or about August 4, 2014, Dr. Singh began working in the Department of Radiology at

MSKCC/SKI in the lab of Defendant Larson.  Her immediate supervisor was Defendant Pillarsetty.

22.     Defendant Pillarsetty insisted on Dr. Singh's commitment to work in the lab at least until July 31, 2018.  He explained that it was in the Department's and the lab's best interest to keep employees on after having invested resources in their training and specialized work.  Defendant Pillarsetty asserted that grant funding was sufficient for Dr. Singh's salary for 4-5 years.

23.     As a result, Dr. Singh committed to the project and the lab, where she became the only female postdoctoral fellow working under the direct supervision of Defendant Pillarsetty.

24.     Prior to and over the course of Dr. Singh's employment at MSKCC/SKI, Defendant Pillarsetty repeatedly stated that he would help promote Dr. Singh's career.  He promised mentorship in order to assist Dr. Singh in succeeding as a faculty scientist and establish herself as an independent researcher.  Defendant Pillarsetty advised Dr. Singh that she would be sent to conferences and have opportunities to take advantage of advanced training.  Dr. Singh did not know that she would be asked to provide sexual favors in exchange for Defendant Pillarsetty's support.

25.     In or around early August of 2014, Dr. Singh attended the postdoctoral orientation held at MSKCC/SKI.  Among other things, a handbook she received at orientation also stated that postdoctoral fellows would attend a conference at least once a year.

26.     Once she began her work, Dr. Singh was designated as the lead on one project and was given additional responsibilities as a collaborator on other projects.

**IV.     Defendant Pillarsetty's Harassment of Dr. Singh**

27.     Between September of 2014 and August of 2016, Defendant Pillarsetty engaged in

multiple acts of verbal and physical harassment of Dr. Singh, none of which was invited or consented to, and all of which were for the purpose of Defendant Pillarsetty's unilateral sexual gratification and intimidation of Dr. Singh. These acts include, but are not limited to, unwanted touching of Dr. Singh's arms, back, thighs, and breasts, while in public settings and alone in the laboratory, as well as statements about Defendant Pillarsetty's and Defendant Singh's respective marital statuses and circumstances. Examples of these unwanted acts include the following events.

28.     In or around September of 2014, Defendant Pillarsetty invited Dr. Singh to join him and other colleagues at MSKCC/SKI's faculty club. While at the faculty club, Defendant Pillarsetty encouraged Dr. Singh, who does not drink alcohol, to start drinking in order "to fit in with the group." Defendant Pillarsetty, who was drinking that evening, made unwanted and inappropriate physical contact with Dr. Singh by hugging her tightly and rubbing her back without her consent. This conduct occurred in front of their colleagues.

29.     Dr. Singh was so uncomfortable with being subjected to this public, unwelcome conduct, that she became fearful of returning to the faculty club, despite Defendant Pillarsetty's repeated invitations over the next three months.

30.     Between October and December of 2014, Defendant Pillarsetty pressed Dr. Singh to join him at the faculty club numerous times. Dr. Singh declined his invitations in hopes of avoiding further inappropriate physical contact with Defendant Pillarsetty.

31.     Recognizing that social interaction with Dr. Singh outside of the lab was not feasible, Defendant Pillarsetty decided to change tactics. In or around January of 2015, Defendant Pillarsetty began giving Dr. Singh additional work unrelated to her projects. The work assigned by Defendant Pillarsetty often kept Dr. Singh in the lab after regular hours. Dr.

Singh's male colleagues in the lab did not receive similar assignments.

32.    Having successfully isolated her and without any coworkers around to witness it, Defendant Pillarsetty continued his unwarranted physical contact with his subordinate, Dr. Singh, without her consent.  Defendant Pillarsetty regularly found reason to be in Dr. Singh's personal space and at different times, leaned on her, touched her arm and/or shoulder while sitting at her desk with her.  Dr. Singh believed his frequent touching was designed for Defendant Pillarsetty's own sexual gratification.

33.    In or around February and March of 2015, Defendant Pillarsetty initiated conversations designed to elicit personal details about Dr. Singh.  In response to his questions, Dr. Singh revealed that she was divorced and single, with no family in the United States. Defendant Pillarsetty told Dr. Singh that he was not happy in his marriage and was looking for another romantic partner.  Dr. Singh did not know how to respond to these inappropriate comments and focused on her work.

34.    In the Spring of 2015, Defendant Pillarsetty continued to assign work unrelated to Dr. Singh's projects that required her to stay later than her colleagues.  During these evenings in the lab, Defendant Pillarsetty frequently touched Dr. Singh without her consent in a manner that Dr. Singh interpreted as designed for the sexual gratification of Defendant Pillarsetty.  Under the guise of looking at her computer screen, Defendant Pillarsetty sat closely behind Dr. Singh and put his hand on her thigh.

35.    On one occasion in the Spring of 2015, Defendant Pillarsetty put his hands on Dr. Singh's shoulders and slid them down Dr. Singh's chest, touching her breasts without her consent.  Defendant Pillarsetty then embraced Dr. Singh tightly from behind.  Dr. Singh was paralyzed with shock.  She attempted to extricate herself from the forced hug by

standing up and walking away from Defendant Pillarsetty, but he just tightened his embrace and rubbed her back as Dr. Singh tried to push him away from her body.  Dr. Singh left the lab to escape him.

36.   On several other occasions during the Spring of 2015, Defendant Pillarsetty persisted in his sexual harassment by touching Dr. Singh's lower back, breasts, hands and shoulder without her consent.  Dr. Singh continued to rebuff Defendant Pillarsetty's sexual advances by standing at a distance from him and leaving the lab when she could.  Dr. Singh did so to signal that Defendant Pillarsetty's physical contact was unwelcome. Defendant Pillarsetty, however, was not deterred.

37.   In the Spring of 2015, Dr. Singh found out that Defendant Pillarsetty deliberately excluded her from meetings with Dr. Giancotti, another Lab Head, and Dr. Singh's colleague, Dr. Goutam, with whom Dr. Singh collaborated on a project.  She only became aware of the meetings when Dr. Goutam questioned Dr. Singh about the reason for her absence from them.  She did not tell Dr. Goutam that Defendant Pillarsetty never invited her to the meetings.

38.   In or around July of 2015, Dr. Singh requested and was denied permission to register for and attend the World Molecular Imaging Conference by Defendant Pillarsetty, despite her abstract having been selected for poster presentation.  Defendant Pillarsetty then had a male colleague of Dr. Singh's present her work.  In fact, Dr. Singh's male colleagues in the lab were given the opportunity to attend at least one conference a year, while Dr. Singh was not afforded anything remotely close to such opportunities.

39.   Defendant Pillarsetty told Dr. Singh that she would have been allowed to attend a conference with her colleagues if she were "more friendly" with him, and that being

successful in her career required "more than just hard work"; the implication being that in order to be successful at MSKCC/SKI, Dr. Singh had to accept Defendant Pillarsetty's sexual advances.

40. During the Summer of 2015, Defendant Pillarsetty threatened Dr. Singh with the loss of her job if she discussed their conversations with her lab colleagues. This was not the only time Dr. Singh's job was threatened by Defendant Pillarsetty.

**V.     Dr. Singh's First Attempt to Report the Abuse**

41. In September of 2015, when Defendant Pillarsetty's sexual misconduct became intolerable to Dr. Singh, she met with the head of the lab, Defendant Larson. Dr. Singh reported Defendant Pillarsetty's sexual advances towards her and the professional retaliation and disparate treatment she suffered for not reciprocating. Defendant Larson failed to address the situation and never responded to Dr. Singh's complaints.

42. In November of 2015, Dr. Singh had to return to India to renew her visa, which had expired. In conjunction, she took her first vacation in 14 months to see her family. Her plan was to stay for a month, however, prior to her return, she fell ill with dengue fever and was too sick to travel back to the United States as scheduled. After her eventual return to MSKCC/SKI once she had recovered from her serious illness, Defendant Pillarsetty told Dr. Singh she could have lost her job for staying in India longer than he had expected and approved.

43. In or around January of 2016, when Dr. Singh inquired if she may attend a conference, Defendant Pillarsetty told her she should be grateful that she still had a job and rejected her request.

44. In or around February of 2016, after the rest of the lab had left for the day, Defendant

Pillarsetty told Dr. Singh, "You have a lot of potential.  I will help you succeed. I really like you and I mean it."  Dr. Singh interpreted this statement as an implicit request for sexual favors in exchange for Defendant Pillarsetty's help with her career.

45.    In or around March and April of 2016, Defendant Pillarsetty approached Dr. Singh from behind in an empty lobby outside of the lab and grabbed her shoulders in a manner that Dr. Singh interpreted as designed to sexually gratify Defendant Pillarsetty and intimidate Dr. Singh.  Dr. Singh was terrified because they were alone and she did not see him approach.

46.    Several times during the Spring of 2016, when the two of them were alone and discussing experiments, Defendant Pillarsetty put his hand on Dr. Singh's shoulders without her permission, in a manner designed to sexually gratify Defendant Pillarsetty and intimidate Dr. Singh.

47.    On one occasion, Defendant Pillarsetty approached Dr. Singh from behind while she was trying to fix lab equipment on a counter.  Defendant Pillarsetty put his hands on Dr. Singh's waist without her consent and moved them down onto her buttocks in a manner designed to sexually gratify Defendant Pillarsetty.  Defendant Pillarsetty pushed his body against Dr. Singh's and hugged her so closely that Dr. Singh could smell alcohol on Defendant Pillarsetty's breath.  Dr. Singh pulled away to put distance between them.

48.    During the same period, Defendant Pillarsetty told Dr. Singh, "Why do you think I started drinking too much?  Because I have to deal with you."  This alarmed Dr. Singh.  Defendant Pillarsetty also told Dr. Singh she should be grateful to him for doing so much for her, saying "Nobody else will do this for you."  The same evening, a Friday, Defendant Pillarsetty again invited Dr. Singh to the faculty club after work.  Dr. Singh

felt pressured, but could not come up with an excuse not to join him on the spot.

49.     Once at the faculty club, Defendant Pillarsetty resumed his inappropriate behavior by

touching Dr. Singh's thigh while attempting to elicit intimate details about Dr. Singh's

personal and romantic life.  He asked Dr. Singh, "Why don't you give anyone a chance?

Is it because of your divorce?"  Dr. Singh felt that Defendant Pillarsetty used the personal

details he learned about her to deliberately make her feel uncomfortable.  Dr. Singh felt

that the only way to avoid Defendant Pillarsetty's advances was to leave the faculty club.

**VI.     Dr. Singh's Second Attempt to Report the Abuse**

50.     Thereafter, Dr. Singh decided to schedule another appointment with Defendant Larson to

ask for his help.  The only way to do so was to ask April Due, Defendant Larson's

secretary, who handled his calendar, to arrange the meeting with Defendant Larson.

When Ms. Due inquired about the reason for the meeting, Dr. Singh told her that it

concerned unwelcome advances and touching by Defendant Pillarsetty.  Ms. Due told Dr.

Singh that Defendant Larson was traveling and unavailable to speak with Dr. Singh.

51.     In or around May of 2016, Defendant Pillarsetty initiated yet another inappropriate

conversation with Dr. Singh, this time about his unhappy marriage.  He told Dr. Singh

that his wife was too busy with work and they did not spend enough time together, but

that it was "not a big deal in Western culture to have another partner" while married.

Defendant Pillarsetty said that it was "more important to be happy than to follow the

rules."  He asked if Dr. Singh ever had a boyfriend in the years since her divorce and how

she spent her time without a partner when she had "sexual desires" and a libido.

Defendant Pillarsetty told Dr. Singh that he could "be [her] friend and support [her]" but

that she was ignoring him.  He said that Dr. Singh was an attractive woman who had "a

lot of potential and [she] should use it." Dr. Singh believed this conversation was another thinly-veiled attempt to demand that Dr. Singh reciprocate Defendant Pillarsetty's sexual advances in exchange for his professional support of Dr. Singh.

52. During the months of April and May of 2016, Dr. Singh continued to be subjected to sexual behavior and touching, accompanied by comments designed to convince Dr. Singh of Defendant Pillarsetty's feelings for her. During a discussion of an experiment in his office, Defendant Pillarsetty, putting his hands on her thighs, told Dr. Singh, "I want to make you a successful woman. I care about you a lot. I really love you. … I told you many times and I mean it." He told Dr. Singh that he could "help [her] succeed" because he "[had] a lot of connections" and knows "a lot of influential people at MSKCC." Placing his hands on Dr. Singh's shoulders, he urged Dr. Singh to "enjoy [her] life" and give people like him a chance. Defendant Pillarsetty complained that Dr. Singh avoided him and his invitations and she has "seen the results" of that because she has "not gone to any conferences." Defendant Pillarsetty continued by saying, "Science is not enough to succeed. You have to give special favors. This is how things work in the modern world."

53. Defendant Pillarsetty promised to keep anything that happened between him and Dr. Singh a secret, saying "whatever happens in this room stays in the room." During the conversation, he reiterated that he drank because of Dr. Singh and that she "was always on [his] mind." Finally, Defendant Pillarsetty tried to convince Dr. Singh that in America, it was "always give and take," because "everyone needs something in return." "Don't you want to be successful?" he asked Dr. Singh, adding, "I will help you with everything but you do have to listen to me sometimes." Dr. Singh struggled to minimize

the unwanted physical contact with Defendant Pillarsetty, told him that she had to finish an experiment and managed to leave.

**VII.   Dr. Singh Makes Plans To Leave**

54.     Dr. Singh tried to make arrangements to remove herself from Defendant Pillarsetty's environment.  In the Spring of 2016, Dr. Singh met with other researchers at MSKCC to explore potential job opportunities in other labs after finishing her projects in Defendant Larson's lab.

55.     Shortly thereafter, Defendant Pillarsetty called Dr. Singh into his office.  He told Dr. Singh that the Department had invested significant resources into her training; Dr. Singh would be expected to stay so that the Department could benefit from her skills and expertise.  Dr. Singh felt threatened when Defendant Pillarsetty told her, "You know that you will not get a job without a recommendation letter in our field.  If you are looking for another job, I might not give you a letter.  Why would I give you a letter?"

56.      Defendant Pillarsetty continued to pressure Dr. Singh to give in to his demands.  "Hard work is not enough. … Do yourself a favor and be an adult."  He told Dr. Singh that her life would be easier if she stopped insulting him by rejecting his advances, saying, "This place is not India, this is a give and take culture.  You are not giving me anything in return.  Who are you waiting for?"  Defendant Pillarsetty then tried to appeal to Dr. Singh, saying "I love you, and I'm attracted to you.  You don't even come for drinks and fun together.  Why do you expect me to do anything for you?"  Dr. Singh responded that she believed that having a relationship with a married man or with a work colleague was unethical and conflicted with her moral values.

**VIII.   Dr. Singh's Third Attempt to Report the Abuse**

57.     On or about June 23, 2016, Dr. Singh tried again to report Defendant Pillarsetty's sexual

harassment and ask Defendant Larson for help.  Ms. Due agreed to schedule a meeting

involving HR.

58.     In an effort to put an end to Defendant Pillarsetty's misconduct, Dr. Singh met with Dr.

Ushma Neill, a Vice President of Scientific Education and Training, on or about June 30,

2016, and told her about the sexual harassment she experienced from Defendant

Pillarsetty.  Dr. Singh asked Dr. Neill for help to find a way to publish the two papers she

was working on, without involving Defendant Pillarsetty.  Dr. Neill inquired about

potential supervisors Dr. Singh would like to work with and recommended some herself.

Dr. Neill told Dr. Singh that she found Defendant Pillarsetty's behavior unacceptable but

said she would keep the matter confidential and help Dr. Singh resolve it.  Dr. Singh also

shared with Dr. Neill that Defendant Pillarsetty's sexual misconduct was affecting her

health.  At Dr. Neill's suggestion, Dr. Singh went to Employee Health Counseling and

spoke to a therapist.

59.     On or about July 5, 2016 Dr. Singh also met with a colleague of Dr. Neill's, Dr. Thomas

Magaldi.  Dr. Singh detailed the incidents of sexual harassment, and the threats to her

career if she did not comply.  Dr. Singh explained that as a foreign national on an H1B

visa in the United States, the validity of which was dependent on her employment, she

was in a vulnerable and difficult position.  Dr. Magaldi assured Dr. Singh that he would

do what he could to help Dr. Singh.  Dr. Magaldi said these issues arise quite frequently

between postdoctoral fellows and Lab Heads and his group helps transfer fellows

internally and get credit for their work.

60.    Subsequently, Dr. Singh also shared with her colleague, Ritu Kushwaha, that Defendant

Pillarsetty was subjecting Dr. Singh to sexual harassment.

**IX.    Dr. Singh's Meeting with Defendant Larson**

61.    In the midst of raising these complaints, Dr. Singh was informed that Defendant Larson

would meet with her on July 6, 2016.  Dr. Singh assumed that Defendant Larson was

willing to meet with her regarding her complaint against Defendant Pillarsetty.

62.    Much to Dr. Singh's surprise, Defendants Larson and Pillarsetty, and Roselinda Herard

Severin, the Department Fund Manager, were all present at the meeting, without anyone

from Human Resources.

63.    As soon as the meeting started, Dr. Singh was told that her employment contract with

MSKCC/SKI would be terminated, and not renewed, as a result of her performance

issues.  When she pressed Defendant Larson to articulate the purported performance

issues that led to her termination, Defendant Larson stated that the reason for the decision

may not be her performance issues but rather that she and Defendant Pillarsetty "did not

get along."  Dr. Singh refused to sign the separation letter presented to her at the meeting

for her signature.

64.    MSKCC/SKI ultimately agreed to terminate Dr. Singh's contract on September 30, 2016,

to enable Dr. Singh to find another job.  No one, however, addressed Dr. Singh's

complaints about Defendant Pillarsetty's sexual misconduct, of which multiple people at

MSKCC/SKI have been made aware.  As a result, Dr. Singh was forced to continue to

work alongside her abuser for three months, even after she was terminated for the

performance issues Defendant Pillarsetty invented as retaliation for her rejection.

65.    In August of 2016, Defendant Pillarsetty and Dr. Singh discussed ongoing experiments.

During the meeting, Defendant Pillarsetty touched Dr. Singh's back and buttocks without her consent, in a manner that Dr. Singh interpreted as designed to sexually gratify Defendant Pillarsetty .

66. On or about August 24, 2016, Dr. Singh reported the sexual harassment she was subjected to by Defendant Pillarsetty to Maria Fernandez in MSKCC/SKI's Human Resources Department.

## X.  Dr. Singh's Termination Was Retaliatory

67. Dr. Singh received positive feedback about her work performance at MSKCC.  Between April 2015 and March 2016, Defendants Pillarsetty and Larson wrote eight letters of recommendation for Dr. Singh in which they praised her work abilities and performance. In a March 11, 2016 letter, Defendant Larson recommended Dr. Singh "with highest enthusiasm" and described her scientific methods as "innovative" and that she was "capable of working independently."  In a letter of the same date, Defendant Pillarsetty similarly "enthusiastically recommend[ed]" Dr. Singh and described her as an "excellent researcher."

68. The only contemporaneous complaints by Defendant Pillarsetty about Dr. Singh's performance were contained in two emails dated February 13, 2015 and April 19, 2015. There was no written warning to Dr. Singh concerning her performance or the possibility of not being reappointed.

69. In fact, Dr. Singh's contract was renewed for an additional year on July 31, 2015.

70. Dr. Singh did not receive formal performance reviews.  In July 2015, after an informal discussion between Dr. Pillarsetty and Dr. Singh, Dr. Singh produced a self-assessment highlighting areas of intended growth and improvement.

71.     As recently as June 2016, Dr. Singh presented material to Dr. Lewis and Defendant
        Larson.  Defendant Pillarsetty told Dr. Singh that he was happy with her presentation and
        that she did a very good job.  Even that praise, however, came with the non-consensual
        touching of Dr. Singh's shoulders that Dr. Singh interpreted as intended for the unilateral
        sexual gratification of Defendant Pillarsetty.  Defendant Pillarsetty told Dr. Singh, "I
        tried to be your friend but nothing worked on you."

## XI.     MSKCC/SKI Ratifies Defendant Pillarsetty's Behavior

72.     MSKCC/SKI, through Defendant Larson, was or should have been aware of the relentless
        verbal and physical harassment, unwelcome intimacies and inappropriate comments
        Defendant Pillarsetty imposed upon Dr. Singh.  Its condonation is a ratification of
        Pillarsetty's improper behavior.

73.     Dr. Singh has attempted to find work since September 2016 but has been unsuccessful.
        On at least two occasions, prospective employers have cancelled interviews with Dr.
        Singh after contacting Defendant Larson for a reference.  Other prospective employers
        have stated that Dr. Singh's references were not satisfactory.

74.     Pursuant to her agreement with MSKCC/SKI, Dr. Singh's annual stipend was set at
        $48,048.  In the absence of Defendants' retaliatory conduct, she would have remained
        employed through the full term of her appointment, until July of 2018.  During that
        period of nearly two years, she would have been entitled to earn approximately $88,000,
        not including benefits.

75.     Upon information and belief, following her retaliatory termination, Defendants are
        attempting to deprive Dr. Singh from first authorship or co-authorship credit for future
        planned or potential publications Dr. Singh would be entitled to as a result of her work

during her employment with Defendants.  Dr. Singh's career will be irreparably damaged if she is deprived from receiving such credit.

76.     Had Dr. Singh not been subject to the sexual harassment and discrimination of Defendant Pillarsetty and the other Defendants, including their retaliation and defamation, she would have been in a position to obtain new employment in her field.  Having been wrongfully prevented from doing so, Dr. Singh has been damaged in an amount equivalent to the market rate for a skilled research scientist at her level of education and experience.

## AS AND FOR A FIRST CAUSE OF ACTION
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
(Against MSKCC and SKI)

77.     Dr. Singh repeats and reiterates each and every allegation set forth above as if fully set forth herein.

78.     The acts complained of above constitute a continuing series of adverse and retaliatory employment acts.

79.     The acts complained of above constitute a violation of the Dr. Singh's rights pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., as amended in 1991.

80.     Dr. Singh seeks all remedies provided under Title VII for the discrimination based upon sex, and the retaliation of the Defendants against Dr. Singh for reporting sexual harassment by the Defendant Pillarsetty.

81.     Thus, there is now due and owing from the Defendants to Dr. Singh, back pay with interest from October 1, 2016, front pay in an amount to be determined by the court, punitive damages in an amount to be determined at trial, the monetary value of health

care and other benefits Ms. Singh has been deprived of by the actions of the Defendants, as well as attorney's fees, the remedies provided a Plaintiff under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq. as amended in 1991, for suffering sexual harassment and retaliation in the workplace.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
<u>**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**</u>
(Against All Defendants)

82.    Dr. Singh repeats and reiterates each and every allegation set forth above as if fully set forth herein.

83.    As a result of the discriminatory and retaliatory acts of the Defendants as alleged above, Dr. Singh has suffered physical and emotional illness.

84.    The physical and emotional illnesses constitute pain and suffering.

85.    Said actions of Defendants discriminating against Dr. Singh because of her sex, and the retaliation for reporting the sexual harassment by Defendant Pillarsetty constitute violations of Dr. Singh's rights under New York State Human Rights Law, Executive Law (Article 15), § 290 et. seq.

86.    Dr. Singh seeks all remedies available under NYSHRL, including recovery for pain and suffering.

87.    As a result of the actions of the Defendants, Dr. Singh has suffered cognizable damages recoverable under NYSHRL.

88.    Thus, because of Defendants' violations of NYSHRL, there is now due and owing from the Defendants to Dr. Singh, back pay with interest from October 1, 2016, front pay in an amount to be determined by the court, lost health insurance and other benefits in an amount to be determined at trial, liquidated damages in an amount to be determined by

the court, plus benefits to be determined at trial, and pain and suffering in the amount of $1,000,000.00, and the remedies provided a Plaintiff under the provisions of New York State Human Rights Law, Executive Law (Article 15), Sec. 290 et. seq. for suffering the unlawful retaliatory termination and sexual harassment in the work place.

## AS AND FOR A THIRD CAUSE OF ACTION
## VIOLATION OF THE NYC HUMAN RIGHTS LAW
(Against All Defendants)

89.   Dr. Singh hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

90.   Defendants have discriminated against Dr. Singh on the basis of her sex in violation of the NYCHRL by denying her equal terms and conditions of employment, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and sexual harassment, leading to her termination.

91.   Defendants have discriminated against Dr. Singh on the basis of her sex in violation of the NYCHRL by creating, fostering, and condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

92.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Dr. Singh has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

93.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Dr. Singh has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional

pain and suffering for which she is entitled to an award of monetary damages and other relief.

94.     Defendants' unlawful and discriminatory conduct constitutes willful or wanton negligence, or recklessness, or a conscious disregard of Dr. Singh's rights or conduct so reckless as to amount to such disregard in violation of the NYCHRL for which Dr. Singh is entitled to an award of punitive damages.

95.     Thus, there is now due and owing from the Defendants to Dr. Singh, back pay with interest from October 1, 2016, front pay in an amount to be determined by the court, compensatory damages, attorney's fees, and remedies provided a Plaintiff under the provisions of NYC Human Rights Law Administrative Code §§ 8-107 et seq. for suffering sexual harassment and unlawful retaliatory termination in the work place.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**CIVIL BATTERY**
(Against All Defendants)

96.     Dr. Singh hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

97.     Defendant Pillarsetty intended to commit an act of unwanted contact against Dr. Singh. He did so both in public and by isolating Dr. Singh in the lab after hours to pressure Dr. Singh for sexual favors.

98.     Defendant Pillarsetty did commit frequent, unwanted sexual contact with Dr. Singh in a harmful or offensive manner, including, but not limited to, touching Dr. Singh's shoulders, back, breast, lower back, thighs and buttocks in a manner designed for Defendant Pillarsetty's own sexual gratification.

99.     Defendant Pillarsetty's battery of Dr. Singh caused harm, including physical, mental and emotional harm.

100.    Defendant Pillarsetty's conduct was not only committed within the scope of his employment at MSKCC/SKI and under Defendant Larson's supervision, but also at their place of work and the faculty club of MSKCC/SKI.

101.    Holding Defendant Larson and MSKCC/SKI liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and adequate treatment of complaints.

## AS AND FOR A FIFTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against All Defendants)

102.    Dr. Singh hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

103.    Defendant Pillarsetty's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Dr. Singh.

104.    Defendant Pillarsetty's outrageous conduct was not a one-off occurrence or ordinary flirtation that women are expected to weather.  Defendant Pillarsetty's repeated, unrelenting and escalating sexual harassment against Dr. Singh exceeded the bounds of decency, regardless of his position as her direct supervisor.

105.    Defendant Pillarsetty acted with intent and recklessness, knowing that Dr. Singh was likely to endure emotional distress.  Defendant Pillarsetty exploited Dr. Singh's vulnerable position as a subordinate and as foreign national on a visa for her fellowship to threaten and intimidate her and prevent her from complaining of his actions.

Defendant Pillarsetty did so with deliberate disregard for the possibility that Dr. Singh would experience severe emotional distress.

106. Defendant Pillarsetty's conduct was not only committed within the scope of his employment at MSKCC/SKI and under Defendant Larson's supervision, but also at their place of work and the faculty club of MSKCC/SKI.

107. Holding Defendant Larson and MSKCC/SKI liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and adequate treatment of complaints.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Against All Defendants)

108. Dr. Singh hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

109. Defendant Pillarsetty's conduct negligently caused emotional distress to Dr. Singh.

110. Defendant Pillarsetty could reasonably foresee that his actions would have cause emotional distress to Dr. Singh.

111. Dr. Singh was in a specific zone of danger working in the same lab with Defendant Pillarsetty and at a risk of unwanted sexual contact and civil battery, causing her to fear working alone in the lab with him.

112. Dr. Singh, immediately or shortly after each occurrence of unwanted sexual contact suffered distress and emotional harm.

113. Defendant Pillarsetty's conduct was not only committed within the scope of his employment at MSKCC/SKI and under Defendant Larson's supervision, but also at their place of work and the faculty club of MSKCC/SKI.

114.     Holding Defendant Larson and MSKCC/SKI liable furthers the policy goals of

*respondeat superior*, including the prevention of future injuries and adequate treatment of

complaints.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## DEFAMATION PER SE

(Against Defendants Pillarsetty and Larson)

115.     Dr. Singh hereby repeats and re-alleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

116.     Defendants Pillarsetty and Larson together and individually, have defamed Dr. Singh by

knowingly, intentionally, willfully or negligently making or publishing false statements

about Dr. Singh which they knew or should have known to be false.

117.     Defendants Pillarsetty and Larson, together and/or individually made or published false

statements about Dr. Singh's professional abilities and work performance that are

Defamation *Per Se*.

118.     A statement is *per se* defamatory if it falsely imputes to another characteristics

incompatible with the proper exercise of her lawful profession; in other words, if it

tended to injure Plaintiff in her trade or profession.

119.     Among other false statements, designed to provide an alternate explanation for the

termination of Dr. Singh, Defendants have been providing references/recommendations

to prospective employers of Dr. Singh.  As a result of these references, at least two

interviews for potential job opportunities were cancelled.

120.     Other prospective employers who interviewed Dr. Singh stated that her references were

not satisfactory.

121.    Defendants Pillarsetty and Larson, together and individually, knew that their statements to third parties would cause severe damage to the professional reputation, career and employment prospects of Dr. Singh.

122.    Dr. Singh's professional reputation and her ability to practice her chosen profession have been damaged.

### PRAYER FOR RELIEF

WHEREFORE, Dr. Singh requests relief as follows:

(a) A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate Title VII of the Civil Rights Act of 1964, and the Human Rights Laws of the State and City of New York;

(b) An injunction and order permanently restraining Defendants and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the practices complained of herein;

(c) An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment and post judgment interest, to compensate Dr. Singh for all monetary and/or economic harm, including, but not limited to, loss of income; for harm to her professional reputation and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, stress and anxiety, embarrassment and humiliation; all other monetary and/or non-monetary losses suffered by Dr. Singh;

(d) An award of punitive damages in an amount to be determined at trial;

(e) An award of costs that Dr. Singh has incurred in this action, including, but not limited to, expert witness fees, as well as Dr. Singh's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

(f) Such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Singh demands a jury trial as to all issues triable by a jury.

DATED:  May 30, 2018
        New York, New York

                                QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP


                                By: */s/* Jennifer J. Barrett
                                    Jennifer J. Barrett
                                        jenniferbarrett@quinnemanuel.com
                                    Nora Feher
                                        norafeher@quinnemanuel.com

                                51 Madison Avenue, 22nd Floor
                                New York, New York 10010-1601
                                (212) 849-7000

                                *Attorneys for Plaintiff*